Filed 8/28/23  In re J.M. CA4/2
See Concurring and Dissenting Opinion

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E080227 |
| Plaintiff and Respondent; | (Super.Ct.No. RIJ1200752) |
| v. | OPINION |
| J.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Reversed.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Catherine E. Rupp, Deputy County Counsel, for Plaintiff and Respondent.

1

Father J.S. appeals from a judgment terminating his parental rights to his daughter, J.M., who was nearly two years of age when the family came to the attention of the Riverside Department of Public Social Services (DPSS or Department). The child was removed from her parents' custody after her mother[1] gave birth to a younger half-sibling, who is not involved in this appeal, where both mother and child tested positive for methamphetamines. Two of the parents' older children had been dependents who were eventually freed for adoption due to unsuccessful reunification attempts, and the newborn had been placed with his father, J.V., due to the mother's lengthy substance abuse history. The juvenile court established jurisdiction over J.M. under Welfare and Institutions Code,[2] section 300, subdivision (b)(1), found the Indian Child Welfare Act (ICWA) did not apply, removed custody of the child, and denied reunification services to the parents. Subsequently, parental rights were terminated as to J.M., and father appealed.

On appeal, father's sole argument is that the trial court erred in making a finding that ICWA did not apply because the court and the Department failed to discharge their duties of inquiry about Native American Ancestry. We conditionally reverse.

---

[1] Mother is not a party to this appeal. References to her are provided only for historical context.

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

## BACKGROUND

Because no substantive claims of error have been asserted, a detailed factual background is unnecessary:

On May 2, 2020, the Department received a referral alleging general neglect, shortly after mother, Audrey M., gave birth to Jo. V., the minor's half-sibling. Mother and JoV. tested positive for amphetamines. Mother admitted using methamphetamine three days prior to delivery but maintained she had been clean until a few days before then. Mother admitted she had started using methamphetamine at age 16, but denied she had a problem with it and only used recreationally. Mother was not interested in drug treatment but agreed to attend a program if she had to.

Jo.V. did not show signs of withdrawal, but mother was not participating in his care and there was concern for her lack of bonding. Mother had limited prenatal care and planned to bottle feed the infant and intended to have the baby live with his father, Jose V. The father of Jo.V., J.V. denied use of controlled substances himself; he submitted to a drug test at the Department's request, and the results were negative. Father V., who lived at his mother's residence and had adequate provisions for the baby, was unaware of mother's drug use. He agreed to complete parenting education, filed for custody, and that child was maintained in his care with maintenance services.

The Department was also aware that mother had care of J.M., who was 19 months of age, and who was fathered by J.S., the appellant in this matter, and was concerned about the parents' ability to protect J.M. When the social worker asked mother about

3

J.M., mother said she was in father J.S.'s care. However, the whereabouts of J.M. were unknown because mother had not returned contact with the Department and had not surrendered the child. At some point the social worker was informed that J.M. may have been sent to the residence of the paternal grandmother, but father did not return calls initially to confirm.

The social worker was finally able to contact father, mother and J.M. Father appeared to be under the influence of a controlled substance, but indicated he saw J.M. daily at his mother's residence. Mother reported that father had helped raise J.M. when he was not incarcerated. However, he was unable to provide the social worker with the address for his mother. Both mother and father refused to submit to an oral swab drug test. Father had recently been released from custody after serving a two-year sentence at Folsom. While the social worker was present, father was arrested on outstanding warrants for burglary and grand theft.

J.M., when examined by the social worker, was found to have a swollen eye (attributed to a burst Tide Pod) and eczema. The social worker informed the parents that J.M. would be taken into protective custody and requested that mother surrender the child.

The social worker provided verbal notice of the detention hearing to the father,[3] paternal grandmother (L.S.), paternal aunt (E.H.), paternal aunt (E.A.)

---

[3] The detention report does not indicate why father was not asked about J.M.'s whereabouts if the social worker went to the address for him that mother had provided.

4

Prior child welfare history showed that in addition to J.M., Mother had two other children by J.S., I.S. and J.S., Jr., both of whom were removed from the parents care due to drug abuse issues, domestic violence and/ or leaving their child with individuals who abuse drugs. Reunification services had been provided (and later terminated in June 2014) to the parents for I.S., but services were denied for J.S., Jr., who was then freed for adoption in November 2014. A third child, H.M. a half-sibling, was also a dependent child who was freed for adoption in 2017.

Attached to the detention report was a form, ICWA-010(A), indicating that the social worker asked both parents about possible Native American ancestry. The social worker indicated the parents "gave me no reason to believe the child is or may be an Indian child."

A protective custody warrant was issued respecting J.M. On July 1, 2020, a dependency petition was filed under section 300, subdivision (b)(1), alleging the chronic substance abuse histories of each parent, their extensive criminal histories, as well as allegations related to prior child welfare history leading to the terminations of parental rights as the older children. The petition also included an allegation under section 300, subdivision (g), relating to father's recent arrest, alleging his failure to make provisions for J.M.

At the detention hearing, the parents appeared and denied the allegations in the petition. They were given forms (ICWA-020) to execute and directed to return the completed forms to the court before they left the court regarding possible Native

5

American ancestry.  The court made prima facie findings of potential juvenile court jurisdiction and ordered the detention of J.M.  The court found there was substantial danger to the child under section 319, subdivision (b)(1), that there was a substantial risk that a parent was likely to flee the jurisdiction under section 319, subdivision (b)(2), and ordered the parents to return with the child in the afternoon.

Later that afternoon, the parents reappeared with the child and a non-relative extended family member (NREFM), A.M.  The parents had placed the child with the NREFM that very day, and had attempted to initiate a temporary guardianship.  The court ordered that J.M. be detained.  The protective custody warrant was recalled, and the court temporarily maintained the child with the NREFM after informally assessing her in open court and directed that the Department conduct a formal assessment for placement.  At the conclusion of the proceedings, mother submitted her executed ICWA-020 form, indicating no Indian heritage, but father did not.  The juvenile court found ICWA did not apply.

In the Jurisdiction-Disposition report, the Department recommended that the court declare J.M. to be a dependent, remove custody of the child from the parents, and to maintain the child in the home of the NREFM.  The Department recommended that the court make true findings on all the allegations under section 300, subdivision (b)(1) (allegations b-1 through b-6), but that the allegation under section 300, subdivision (g) be dismissed because father had been released from custody.  The Department also

recommended that the court deny reunification services to both parents pursuant to section 361.5, subdivisions (b)(10), (b)(11) and (b)(13).

In the section relating to ICWA information, the report noted that on May 2, 2020, mother denied any Indian ancestry, and that on June 28, 2020, father also denied any Indian ancestry. The dates to which the social worker referred were the dates of her initial contacts with the parents.

On August 6, 2020, the social worker submitted an Addendum report to inform the court mother had been provided with a resource packet, and that mother had declined to be interviewed for the jurisdiction report. Mother also informed the social worker she wished to relinquish her parental rights. J.M. was doing well in her placement, with a family in which she had spent time prior to removal. However, the paternal grandmother had also indicated a willingness and desire to be considered for placement.

On August 11, 2020, the court conducted the contested jurisdiction hearing. The parents made a motion to bifurcate the disposition hearing from that of the jurisdiction, which was granted. Father was not present and had not been in contact with his counsel, so he did not object to the admission of the social worker's reports in evidence and no affirmative evidence was presented on his behalf, but he did request that the court find the allegations of the petition not true, in particular, the allegations under section 300, subdivision (g). The court made true findings on allegations b-1 through b-6, that the child was a person described by section 300, subdivision (b)(1), and that the Department

7

had conducted sufficient inquiry as to whether the child may have Indian ancestry. The court then trailed the disposition hearing as requested by the parents.

At the disposition hearing held on August 13, 2020, the court declared J.M. to be a dependent child, found clear and convincing evidence of the circumstances stated in section 361, subdivision (c)(1), removed custody of the child from the parents, and denied reunification services to the parents. The court set a date for the hearing to select and implement a permanent plan for the minor, pursuant to section 366.26.

Over the course of the next several months, the child remained in her placement with the NREFM, under a permanent plan of adoption, with the caretaker, A.M. identified as the prospective adoptive parent. However, the section 366.26 hearing was continued several times to complete the adoption assessment of the caretaker. As of April 2, 2021, the Resource Family Approval (RFA) provisionally approved A.M., but only on condition that E.M., her significant other, and the brother of mother, was not in the home. The social worker requested a preliminary adoption assessment referral.

On June 1, 2021, the Department submitted a post permanency review report in conjunction with its response to mother's request for a change of court order (JV-180)[4], in which it again requested a continuance of the hearing on the selection and implementation of the permanent plan of adoption. The report included the earlier information that the RFA had approved of A.M., but only on the condition that her boyfriend, E.M., not have contact with the child. In April 2021, A.M. informed the

---

[4] That request was subsequently withdrawn.

Department she was not interested in adopting the child and that she had previously indicated her willingness because she felt pressured by relatives. The report also noted that father's visits were not regular and that he had not visited the child since December 2020.

In September 2021, the social worker submitted an addendum report requesting that the child remain in her current placement or other approved placement suitable to meet her needs, because the caretaker was willing to continue caring for J.M. until a replacement could be found and requested another continuance to identify a successor adoptive parent. The caretaker gave the social worker information about several relatives who might be interested in placement.

On October 19, 2021, the Department filed an ex parte application for change of court order regarding placement, because the RFA had informed the social worker that E.M., boyfriend of the caretaker A.M., had not live-scanned, and had a conviction on his record that would require an exemption. Then, the social worker discovered that A.M.'s home had been searched pursuant to a search warrant during which multiple weapons, ammunition, stolen property, and signs of identity theft were found, in addition to unsanitary conditions. A.M.'s conditional RFA approval was therefore about to be rescinded, so the social worker requested authorization to place J.M. with one of the relatives who was interested in taking custody of J.M. On November 29, 2021, the social worker requested another continuance to allow time to establish a permanent plan of

9

adoption. On December 11, 2021, at the regularly schedule post-permanency hearing, the court found that ICWA did not apply, as recommended in the social worker's report.

After more continuances, the hearing for the selection and implementation of the permanent plan took place on October 24, 2022, at which the father's parental rights were severed. Father appealed.

## DISCUSSION

The sole issue raised in this appeal challenges the propriety of the juvenile court's findings that ICWA does not apply, where the Department did not conduct an adequate inquiry. We agree.

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family. (25 U.S.C. § 1902; see *In re Isaiah W*. (2016) 1 Cal.5th 1, 7-8.) In any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child," the Indian custodian and the Indian child's tribe have the right to intervene and may petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (25 U.S.C., §§ 1911, subd. (c), 1914; see § 224, subd. (e)). Under ICWA, a "foster care placement" means "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not

10

been terminated." (25 USCS § 1903 (1)(i).) In other words, ICWA requirements apply only when a child is to be placed in foster care--by whatever means--not when a child remains in the parental home.

Under California law, the juvenile courts, and the child protective agencies, "(but not parents)[, have] an 'affirmative and continuing duty to inquire' whether a child in the dependency proceeding 'is or may be an Indian child.'" (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 741-742, quoting § 224.2, subd. (a).) "That duty to inquire begins with [the] initial contact [citation] and obligates the juvenile court and child protective agencies to ask all relevant involved individuals whether the child may be an Indian child." (*In re T.G.* (2020) 58 Cal.App.5th 275, 290, citing § 224.2, subds. (a)-(c).) Section 224.2, subdivision (a), expressly states the duty to inquire is *not limited* to asking the reporting party if they have information that the child may be an Indian child.

"Under both ICWA and California law, "'extended family member[s]"' include the child's 'grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.'" [Citations.]" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1055; see also, *In re Dominick D.* (2022) 82 Cal.App.5th 560, 567.) Upon each party's first appearance in a dependency proceeding, the juvenile court must ask each participant "whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)), and "[o]rder the parent . . . to complete [an ICWA-020 form]." (Cal. Rules of Court, rule 5.481(a)(2)(C).)

We agree with the father that the Department "clearly failed to comply with its . . . duty of initial inquiry [under ICWA] by not asking extended [paternal] family members . . . about possible Indian ancestry." (*In re Y.M.* (2022) 82 Cal.App.5th 901, 917.) The record contains no indication the Department ever inquired of the paternal grandmother or other readily available paternal relatives about possible Indian ancestry, although the social worker had been in contact with them. Because they were available during the dependency proceedings, the Department should have asked them if they had Indian ancestry and whether J.M. is or may be an Indian child. (§ 224.2, subd. (b); *In re Dominick D., supra*, 82 Cal.App.5th at p. 567.) By failing to do so, the Department failed to discharge its duty of initial inquiry under ICWA, and, in turn, the juvenile court erroneously found that ICWA did not apply. (§ 224.2, subd. (b); *In re D.B., supra*, 87 Cal.App.5th at p. 244, citing *Y.M., supra*, at p. 916; *In re Dominick D., supra*, at p. 567; *In re Ricky R.* (2022) 82 Cal.App.5th 671, 680.)

There is a split of authority among the Courts of Appeal regarding how to evaluate claims of ICWA inquiry error. (See *In re K.H.* (2022) 84 Cal.App.5th 566, 611-618 (K.H.) [summarizing the varied approaches].) The California Supreme Court has granted review on the issue in *In re Dezi C*. (2022) 79 Cal.App.5th 769, review granted September 21, 2022, S275578. However, there appears to be some consensus that the Department's failure to comply with ICWA is prejudicial if "the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M., supra,* 70 Cal.App.5th at p. 744.)

12

That standard does not require "proof of an actual outcome (that the parent may actually have Indian heritage)." (*Id.,* at pp. 743-744.) "'The missing information need only be relevant to the ICWA inquiry, "whatever the outcome will be."'" [Citations.]" (*In re D.B., supra,* 87 Cal.App.5th at p. 245.)

In the present case, the father gave negative responses when asked about Indian heritage in his initial contact with the social worker. At the detention hearing, father reiterated that he had no Indian ancestry, but he did not execute the ICWA-020 form. Several paternal relatives had been contacted by the social worker during the initial investigation of the circumstances leading to the filing of the dependency petition, and were available throughout the proceedings to provide information, but the record does not show the Department ever conducted the initial inquiry of them on the subject. Without the benefit of a proper inquiry, a juvenile court cannot know whether the parents' initial responses on the ICWA-020 form were inaccurate or unreliable. (*In re J.C.* (2022) 77 Cal.App.5th 70, 81, and cases there cited.)

Because federal law does not impose a duty on social workers to inquire of extended family members about tribal affiliation, any error would be under state law. (*In re Benjamin M., supra*, 70 Cal.App.5th at p. 742; *In re A.C.* (2021) 65 Cal.App.5th 1060.) The usual test for prejudicial state law error is whether it results in a miscarriage of justice, insofar as "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see *In re Benjamin M., supra*, at p. 742 [*Watson* standard applies to

13

agency's failure to comply with initial duty of inquiry under California's ICWA-related law].)

Due to the lack of any but the briefest inquiry, we cannot determine if a more favorable result would have been reached. But "where the opportunity to gather the relevant information critical to determining whether the child is or may be an Indian child is lost because there has not been adequate inquiry and due diligence, reversal for correction is generally the only effective safeguard." (*K.H., supra*, 84 Cal.App.5th at p. 610.)

The Department argues that section 224.2 does not require inquiry of extended family members because the duty defined in section 224.2, subdivision (b), is limited in to when the child is placed into temporary custody pursuant to section 306 (§ 224.2, subdivision (b)), and does not apply where, as here, the child is brought into protective custody by means of a protective custody warrant pursuant to section 340. Recently, other panels of this Court agreed with the Department's position, holding that there is no duty to inquire of extended family members where the child was initially removed from the parents pursuant to a protective custody warrant, pursuant to section 340. (*In re Robert F.* (2023) 90 Cal.App.5th 492, review granted July 26, 2023, S279743; *In re Ja.O.* (2023) 91 Cal.App.5th 672, review granted July 26, 2023, S280572.)

In *Robert F.,* the majority relied on language found in the concurrence to *In re Adrian L.* (2022) 86 Cal.App.5th 342, where Justice Kelley stated that subdivision (b) of section 224.2 applies only when a child is placed in temporary custody under section 306;

14

it does not apply when a county welfare department takes a child into protective custody pursuant to a warrant. (*Adrian L., supra,* at p. 355 (conc. opn. of Kelley, J.).) We disagree with this approach because it would frustrate the legislative purpose of section 224.2 and ignores the plain language of ICWA. Further, the interpretation offered in those cases ignores the fact that a child removed by a warrant nonetheless is "received" by the Department within the meaning of section 306, subdivision (b). Instead, we agree with the reasoning of a different panel of this court in *In re Delila D.* (2023) 93 Cal.App.5th 953.

It is true that subdivision (b) of section 224.2 includes references to sections 306 and 307, but the Department overlooks two points: (1) its interpretation misreads section 224.2, subdivision (b), and (2) section 306, subdivision (a) covers situations in which the social worker receives a child pending investigation, who was delivered by a peace officer (§ 306, subd. (a)(1)), which is how children removed pursuant to a warrant are received by the Department.

Thus, if the Department's position is that the duty to inquire of extended relatives only applies to children who are received by the Department by the means described in section 306, that condition is met when a child is picked up by peace officers pursuant to a protective custody warrant and "delivered" to the Department, which then "receives" the child pursuant to section 306, subdivision (a)(1).) Nothing in ICWA indicates that the method by which children are "received by" or "delivered to" the Department affects the

15

duty of inquiry. Instead, the triggering event is the removal of children from their parents and their placement in foster care.

In this respect, as we interpret the express terms of section 224.2, subdivision (b), the criteria for inquiry of extended relatives are met where the express language of section 306, subdivision (a)(1), covers situations in which the Department "receives" a child that is delivered by a peace officer upon the execution of a protective custody warrant that was issued pursuant to section 340, and does not exclude children taken into custody pursuant to a protective custody warrant. We reach this conclusion by examining section 340, subdivision (c), which requires that any child taken into protective custody pursuant to a warrant shall be immediately delivered to the social worker. Therefore, children detained upon the execution of a protective custody warrant are delivered to the social worker within the meaning of section 306, subdivision (a)(1).

It is only in section 306, subdivision (a)(2), authorizing a social worker to immediately "take into and maintain temporary custody" of a child, that the language "without a warrant" appears. This serves the obvious purpose of permitting the social worker to act quickly in the face of exigent circumstances, without the necessity of seeking a pre-petition warrant or waiting until the initial hearing on the petition.

In this respect, the delivery of the child to the Department triggers section 306, subdivisions (a)(1) and (b), whereby the Department "receives" the child, which, in turn, triggers the duty of inquiry pursuant to section 224.2, subdivision (b). Thus, the fact the

16

child was detained upon a warrant does not give rise to a lesser duty of inquiry into Indian ancestry.

This is reinforced by section 306, subdivision (b), which provides, "Upon receiving temporary custody of a child, the county welfare department shall inquire pursuant to section 224.2, whether the child is an Indian child."  This subdivision is not limited to situations in which the social worker removes the child without a warrant, so it applies anytime the Department receives temporary custody of a child.

Reading the statutes together, the duty of inquiry "begins with the initial contact" (§ 224.2, subd. (a)), where the duty of inquiry is not limited to asking the reporting party and continues throughout the proceedings.[5] A child removed pursuant to protective custody warrant under section 340, which may be issued by the juvenile court either before or after a dependency petition has been filed (§ 340, subds. (a), (b)) is "delivered" to the Department within the meaning of section 306, subdivision (b), which then receives the child for out of home placement.  The duty to inquire of extended family members therefore applies to children removed by warrant.

The Department's interpretation of section 224.2, subdivision (b), as followed in the recent case of *In re Robert F., supra,* would frustrate the legislative intent under both state and federal law, which is to insure a continuing, full and complete inquiry respecting possible Native American heritage of children removed from parents' custody,

---

[5] The lack of reference to inquiry of extended relatives in section 224.2, subdivision (a) is of no significance, because at the initial hearing, the court may decide that detention is not necessary, obviating a placement in foster care, which is the real trigger.

contrary to the Department's suggestion. It would mean the duty to inquire of extended family members who might have relevant information about Indian ancestry would never arise unless the child is immediately removed from a parent at the initial contact. This interpretation itself would contravene the policy of preserving family unity and maintaining children with their parents where it would be safe to do so. Our interpretation furthers the legislative intent.

Thus, even if we were to conclude the Department performed its duty at the initial contact pursuant to subdivision (a) of section 224.2, for the period in which the child had not been temporarily removed (by warrant or otherwise), it was required to make inquiry of extended relatives pursuant to section 224.2, subdivision (b) when the child was delivered to the Department within the meaning of section 306, subdivision (a)(1). At this stage, while father orally indicated there was no Indian ancestry, no effort was made to make further inquiry of extended family members as required by section 224.2, subdivision (b). Further, father's ICWA-020 form was not returned to the court before father left the courthouse.[6]

A brief review of ICWA's statutory scheme reveals it is concerned with removals of Indian children from the custody of Indian parents which has an impact on the continuing and future existence of tribes and their sovereignty. (25 U.S.C. §§ 1901, 1902; see also, *Miss. Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 33 [109

---

[6] We have confirmed with the Juvenile Court that the form is not in the court file.

S.Ct. 1597, 1600, 104 L.Ed.2d 29, 37] [referring to congressional hearings respecting the impact of the adoptions on Indian parents and the tribes themselves].)

Once J.M. was removed from parental custody and temporarily placed with the Department, the continuing duty of inquiry pursuant to section 224.2, subdivision (b), arose, requiring the Department in inquire about Indian ancestry of extended family members.  This was not done.  Instead, at the disposition hearing, the minutes of the court's finding (cryptically stating both that "ICWA may apply" and that "ICWA did not apply"), relied on the Department's initial inquiry, conducted prior to the detention hearing, in ruling that the Department had conducted a sufficient inquiry.  In this, the court erred, as no additional inquiry had been made since the initial inquiry despite temporary placement of J.M. in the Department's care at the time of the detention hearing.

Because the duty of initial inquiry was not discharged, we must conditionally reverse and remand the case to fill in the blanks.

## DISPOSITION

The order terminating parental rights is conditionally reversed.  On remand, the juvenile court shall order the Department to comply with the duty of initial inquiry (§ 224.2, subd. (b)) and, if applicable, the duty of further inquiry (§ 224.2, subd. (e)) and the duty to provide notice to the pertinent tribes (25 U.S.C. § 1912(a); § 224.3).  If the juvenile court determines that ICWA does not apply, then the court shall reinstate the

19

order terminating parental rights.  If the court determines that ICWA applies, then it shall proceed in conformity with ICWA and related California law.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____

P. J.

20

[*In re J.M.*, E080227]

Slough, J., Concurring.

For the reasons set out in *In re Delila D.* (2023) 95 Cal.App.5th 953, I agree with the majority opinion's conclusion that the ICWA[1] initial inquiry described in Welfare and Institutions Code section 224.2, subdivision (b) (section 224.2(b)) is not, as our court recently held in *In re Robert F.* (2023) 90 Cal.App.5th 492 (*Robert F.*), limited to cases where the child is initially removed from home without a warrant. (Maj. opn. *ante*, at p. 18.) I write separately to address the reasoning *Robert F.* provides in support of its conclusion that a limited initial inquiry applies to a significant category of children placed in foster care during a dependency proceeding.

Section 224.2(b) was enacted as part of Assembly Bill No. 3176 (2017-2018 Reg. Sess.) (A.B. 3176), which added several new ICWA-related provisions to the Welfare and Institutions Code that became effective January 1, 2019. (Stats. 2018, ch. 833, §§ 1-39.) Our Legislature's dual purposes in enacting A.B. 3176 were to (1) increase tribes' opportunity to be involved in child custody cases involving Indian children and (2) bring California law into compliance with 2016 federal ICWA regulations imposing minimum requirements to state court emergency proceedings involving Indian children. (*In re S.S.* (2023) 90 Cal.App.5th 694, 699-702; Cal. Health and Human Services Agency, Enrolled Bill Rep. on Assem. Bill No. 3176 (2017-2018 Reg. Sess.) prepared for Governor Brown (Aug. 31, 2018 & Sept. 4, 2018) pp. 1-2 (Enrolled Bill Report).) To achieve these goals,

---

[1] Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA).

A.B. 3176 imposed new substantive, time-sensitive ICWA-related requirements for the temporary custody and detention of Indian children and expanded the initial inquiry to include "extended family members, others who have an interest in the child, and the party reporting child abuse or neglect." (§ 224.2(b); see also §§ 306, 319; Stats. 2018, ch. 833, §§ 1-39.)[2] And, after A.B. 3176 went into effect, the Judicial Council revised rule 5.481 of the California Rules of Court to implement the expanded duty of initial inquiry. That rule now provides: "The party seeking a foster-care placement, . . . termination of parental rights, preadoptive placement, or adoption must ask the child, if the child is old enough, and the parents, Indian custodian, or legal guardians, extended family members, others who have an interest in the child, and where applicable the party reporting child abuse or neglect, whether the child is or may be an Indian child . . . ." (Cal. Rules of Court, rule 5.481(a)(1) (rule 5.481).)

In support of its holding, *Robert F.* argues that it makes sense to limit the expanded inquiry enacted by A.B. 3176 to cases where the child was initially removed from home without a warrant because "[t]he warrantless detention of an Indian child . . . triggers [the] especially time-sensitive requirements" the new law added to section 306, and those requirements do not apply to children removed by protective custody warrant. (*Robert F.*, *supra*, 90 Cal.App.5th at p. 501, citing § 306, subd. (d); see also *In re Ja.O.* (2023) 91 Cal.App.5th 672, 681 ["because warrantless detentions trigger various time-sensitive ICWA-related requirements that are otherwise inapplicable (§ 306, subd. (d)), it

---

[2] Unlabeled statutory citations refer to the Welfare and Institutions Code.

2

makes sense in such cases to expand the duty of initial inquiry—confirming whether the child in such a case is an Indian child is *particularly urgent*"], italics added.) I respectfully disagree with this reasoning.

To begin with, A.B. 3176 did not add new ICWA-related requirements to section 306 only. The amendment also added new requirements to section 319, which governs the detention of children at the initial petition hearing. (See Stats. 2018, ch. 833, §§ 19 [amending § 306 to add ICWA-related requirements] & 22 [amending § 306 to add ICWA-related requirements].) For example, as amended by A.B. 3176, section 319 now provides that if a court "knows or there is reason to know the child is an Indian child," it may not detain the child at the initial petition hearing *unless* it "finds that detention is necessary to prevent imminent physical damage or harm" and "state[s] on the record the facts supporting this finding." (§ 319, subd. (d); Stats. 2018, ch. 833, § 22.) Additionally, if the court does order an Indian child detained at the initial petition hearing, the ICWA placement preferences codified in § 361.31 apply to the child's temporary placement unless the court finds "good cause" to deviate from them. (§ 319, subd. (h)(1)(C).) Thus, if a child removed by warrant may be detained from parental custody at the initial petition hearing prior to jurisdiction, A.B. 3176's requirements will apply if there is reason to know the child is an Indian child.

Contrary to *Robert F.*'s view, the reason the first sentence of section 224.2(b) imposes "a duty to inquire whether th[e] child is an Indian child" in cases where the child is "placed into the temporary custody of a county welfare department pursuant to Section

3

306" is because A.B. 3176 imposed heightened requirements for detaining Indian children at the initial petition hearing under section 319 that did not previously exist under California law. In other words, the first sentence is not intended to limit or define the initial inquiry that applies throughout the dependency proceeding. Rather, it is intended to frontload a social worker's investigative duties in cases where the child may be detained at the initial petition hearing.

Because new requirements now apply to the detention of Indian children at the initial petition hearing, the Legislature wanted to ensure that social workers provide juvenile courts with enough ancestry information *in advance of that hearing* to enable the court to determine whether those requirements are triggered. And, because section 319 applies to *both* categories of children—those removed under exigent circumstance and those removed by warrant—there is no reason to treat the latter category differently for purposes of ICWA. (See § 315 ["If a child has been taken into [temporary] custody . . . and not released to a parent or guardian, the juvenile court shall hold a hearing (which shall be referred to as a 'detention hearing') to determine whether the child shall be further detained"].) The need to determine whether a child who may be detained at the initial petition hearing is an Indian child is as urgent for children removed by warrant as it is for children removed without one.

Moreover, the need to determine whether a child is an Indian child does not diminish in urgency once a case moves past the initial petition hearing stage. If anything, it becomes even more important to determine whether ICWA applies once a child has

4

been adjudged a dependent and removed from parental custody at disposition, as the possibility of permanently separating the child from their family is more concrete than at the initial petition stage. *Robert F.*'s holding leads to the irrational result that procedural circumstances predating the initial petition hearing dictate the scope of the initial inquiry throughout the entire proceeding. The result is irrational because the way in which a child is initially removed from home has no bearing on whether they may have Native American ancestry.

In my view, when a child is removed from parental custody after being adjudged a dependent of the court, as J.M. was here, both section 224.2(b) and rule 5.481 require the social worker to ask available extended family members about the child's possible Native American ancestry.

SLOUGH
J.

5

[*In re J.M.; DPSS v. J.S.*, E080227]

MENETREZ, J., Dissenting.

I disagree with the majority opinion's analysis and conclusion concerning the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.). I continue to agree with *In re Robert F.* (2023) 90 Cal.App.5th 492 (*Robert F.*), review granted July 26, 2023, S279743, and *In re Ja.O.* (2023) 91 Cal.App.5th 672, 680 (*Ja.O.*), review granted July 26, 2023, S280572, that the expanded duty of initial inquiry under subdivision (b) of Welfare and Institutions Code section 224.2 applies only if the child was placed into temporary custody without a warrant. For the reasons explained in *In re Andres R.* (August 23, 2023, E079972) __ Cal.App.5th __ [2023 Cal.App. LEXIS 638], I am not persuaded by the criticisms of *Robert F.* that were expressed in *In re Delila D.* (2023) 93 Cal.App.5th 953 (*Delila D.*). (The majority opinion in *Delila D.* never cites *Ja.O.* and does not address its analysis.) Accordingly, I believe that the order terminating parental rights should be affirmed, and I respectfully dissent.

MENETREZ_____
J.

1